**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**TIMOTHY YANTZ,**

**Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1]

**Defendant.**

**No. 12 C 2931**

**Magistrate Judge Mary M. Rowland**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Timothy Yantz filed this action seeking reversal of the final decision of the Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits under Title II of the Social Security Act (SSA). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB) under Title II of the SSA, a claimant must establish that he or she is disabled within the meaning of the SSA.[2]

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

*York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on October 28, 2008, alleging that he became disabled on February 3, 2007, because of degenerative disk disease. (R. at 10, 81, 82, 101, 202). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 10, 81, 82, 97–107, 111).

On September 1, 2010, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (R. at 10, 26–80). The ALJ also heard testimony from Richard T. Fisher, a vocational expert (VE). (*Id.* at 10, 26–80, 144).

The ALJ denied Plaintiff's request for benefits on October 25, 2010. (R. at 10–21). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since February 3, 2007, the alleged onset date. (*Id.* at 12). At step two, the ALJ found that Plaintiff's degenerative disk disease at L3–4 with continued difficulties following surgery is a severe impairment. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.*).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that he can perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), but he must be able to sit or stand at will. (R. at 13). Based on

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

Plaintiff's RFC, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work. (*Id.* at 20). At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including work as parimutuel ticket checker, telephone quotation clerk, and microfilm document preparer. (*Id.* at 20–21). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 21).

The Appeals Council denied Plaintiff's request for review on February 22, 2012. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more

than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

### A. The Relevant Medical Evidence

In July 2006, Plaintiff injured his back at work. (R. at 319). Subsequently, MRIs and x-rays have consistently shown degenerative disk disease. An MRI performed on August 11, 2006, found evidence of degenerative disk disease at L3–4, and to a lesser extent at L4–5 and L5–S1, along with small annular tears at L4–5 and L5–S1. (*Id.* at 292). On May 21, 2007, an MRI showed a mild, broad-based disk bulge at L3–4, mild facet joint hypertrophy bilaterally, mild stenosis of the central canal,

Schmorl's node[4] at L3 with edema, and mild, broad-based disk bulge at L4–5 and L5–S1 with minimal central canal stenosis. (*Id.* at 290–91). A May 19, 2008 MRI showed degenerative changes at L3–4 and reactive marrow changes adjacent to a Schmorl's node at L3. (*Id.* at 300). On October 2, 2008, an x-ray of the lumbar spine found disk space narrowing and degeneration, most pronounced at L3–4, and mild degenerative facet hypertrophy, but no evidence of spondylolisthesis.[5] (*Id.* at 398). An MRI on November 6, 2008, showed degenerative disk disease at L3–4, L4–5, and L5–S1. (*Id.* at 396–97).

Shortly after his injury, Plaintiff sought therapy from a chiropractor and was eventually referred to Jason T. Franklin, D.O. (R. at 319; *see id.* at 334). Dr. Franklin treated him conservatively, using medications, physical therapy, and injections. (*Id.* at 319). On September 1, 2006, Plaintiff rated his pain as 8/10. (*Id.* at 364). Forty percent of the pain was in his back, with the other sixty percent radiating into his groin. (*Id.*). The pain was exacerbated by walking, sitting, and standing. (*Id.*). On examination by Dr. Franklin, internal rotation of the left hip gave Plaintiff some low back pain, with poor hip flexor flexibility, and tenderness in the left buttock area. (*Id.*). Dr. Franklin recommended additional physical therapy and prescribed Ibuprofen 800 mg and Vicodin. (*Id.* at 365).

---

[4] Schmorl's node is "[a]n upward and downward protrusion (pushing into) of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae." <www.medterms.com>

[5] Spondylolisthesis "is a condition of the spine whereby one of the vertebra slips forward or backward compared to the next vertebra." <www.MedicineNet.com>

On September 22, 2006, Plaintiff reported a reduction in his back pain. (R. at 363). Dr. Franklin continued the Ibuprofen and Vicodin and again recommended physical therapy. (*Id.*). On October 22, 2006, Plaintiff reported that his pain was better, rating it as 4/10 and primarily in the lower back area. (*Id.* at 362). He reported taking his medications and had begun physical therapy. (*Id.*). On examination, Dr. Franklin found full range of motion in Plaintiff's hips, knees, ankles, and lumbar spine; intact motor strength; and negative standing flexion test. (*Id.*). Plaintiff did have very poor hip flexor flexibility and poor piriformis[6] flexibility, left more than right. (*Id.*). Dr. Franklin diagnosed low back pain, degenerative disk disease with annular tears, and sacroiliac joint (SIJ) dysfunction. (*Id.*). He renewed Ibuprofen and Vicodin and urged Plaintiff to continue with physical therapy. (*Id.*). On November 17, 2006, Plaintiff reported his pain at 6/10. (*Id.* at 361). Dr. Franklin opined that most of the pain was caused by the SIJ, rather than degenerative disk disease. (*Id.*).

On December 14, 2006, Plaintiff underwent a fluoroscopic right SIJ arthrogram. (R. at 359). His post-procedure pain was 3/10 and he was able to ambulate freely. (*Id.*). On December 29, Plaintiff rated his pain as 5/10, primarily on the right side. (*Id.* at 358). On examination, muscle strength was equal and symmetric, reflexes symmetric, negative slump-sit test, negative straight-leg test, range of motion within functional limits, and negative repeat-standing-flexion test. (*Id.*). Plaintiff did have a positive flexion test on the right side. (*Id.*). Dr. Franklin recommended that

---

[6] Piriformis is "[a] muscle in the pelvic girdle that is closely associated with the sciatic nerve." <medical-dictionary.thefreedictionary.com/piriformis>

Plaintiff's work be restricted to lifting no more than ten pounds; no repeated bending, squatting, twisting, or climbing; no continuous standing or sitting; and no prolonged walking. (*Id.*). On February 9, 2007, Plaintiff reported no improvement in his pain, and did not believe that chiropractic care was helping. (*Id.* at 357). Dr. Franklin recommended that Plaintiff take his Ibuprofen on a regular basis and pursue his home exercise program and referred him to Thomas J. McGivney, M.D., an orthopaedic surgeon (*Id.* at 303, 319, 357).

Plaintiff began treating with Dr. McGivney on February 28, 2007. (R. at 303–04). Plaintiff complained of continuing back pain and numbness. (*Id.* at 303). On examination, Plaintiff had extension to 20° with some pain but no muscle spasms, forward flexion near full to 60° with little pain, negative straight-leg raise, symmetrical deep tendon reflexes, normal strength, full range of motion of knee and ankle, and limited external rotation of both hips, with pain in the posterior SIJ area. (*Id.* at 304). Dr. McGivney diagnosed degenerative disk disease at L3–4 with exacerbation, and annular tear at L4–5 and S1 with minimal degenerative changes. (*Id.*). Dr. McGivney opined that Plaintiff's "degree of disability objectively is mild." (*Id.*). He recommended physical therapy and epidural injections, with future surgery a possibility. (*Id.*). Dr. McGivney found that Plaintiff should be restricted to not lifting over 30 pounds, and no repetitive bending or stooping. (*Id.*).

On April 20, 2007, Plaintiff reported little relief from the epidural injection. (R. at 347). On the contrary, he stated that the pain in his groin had perhaps intensified. (*Id.*). X-rays of his hip were unremarkable. (*Id.*). Plaintiff discussed the possi-

bility of surgery with Dr. Franklin, who recommended that he get a second opinion. (*Id.*).

On May 15, 2007, Plaintiff began treating with Thomas Hurley, M.D. (R. at 288). He complained of low back pain, which was aggravated by walking, bending, or climbing. (*Id.*). On examination, Plaintiff had no pain with straight leg raising or with flexion, abduction, and external rotation of either hip. (*Id.*). Plaintiff's strength was normal, reflexes symmetrical, but sensory examination showed decreased light touch in the right thigh and outer calf. (*Id.* at 288–89). Dr. Hurley diagnosed chronic low back pain and recommended an EMG and a SSEP of Plaintiff's lower extremities.[7] (*Id.* at 289). Dr. Hurley opined that Plaintiff could return to work in a light duty status. (*Id.*). The EMG was performed on May 23, 2007, which was normal, and showed no evidence of peripheral neuropathy, lumbar radiculopathy, or neuromuscular disease. (*Id.* at 293, 295).

On September 6, 2007, Plaintiff reported improved pain management with Motrin and Vicodin. (R. at 287). Dr. Hurley completed an Occupational Health Status Form. (*Id.* at 294). He limited Plaintiff to light/sedentary work; lift/carry/pull five to ten pounds; sit/stand/walk as needed, 40–60 minutes maximum; avoid ladders and slippery, uneven surfaces; and bend/twist/turn rarely, less than 10% of the workday. (*Id.*).

---

[7] An electromyogram (EMG) records the electrical activity of muscles. <www.MedicineNet.com> "Somatosensory Evoked Potential (SSEP) is a noninvasive diagnostic test to assess the speed of electrical conduction across the spinal cord." <www.spine-health.com>

In September and October 2007, Plaintiff attended 20 physical therapy sessions, as part of his workers' compensation claim, with the goal of returning him to full time work. (R. at 371–87). A functional capacity evaluation (FCE) performed on October 4, 2007, found that Plaintiff was capable of very heavy work. (*Id.* at 371).

On April 23, 2008, Plaintiff reported to Dr. McGivney that his back pain was aggravated by sitting, standing, walking, and lying down, and relieved by medications and exercise. (R. at 312). He reported that contrary to the FCE, he was not capable of performing very heavy work. (*Id.* at 314). Dr. McGivney suggested a repeat MRI and discussed a surgery option, but cautioned Plaintiff that surgery would not offer 100% relief. (*Id.*). On April 29, 2008, Plaintiff reported that his back pain was getting worse and requested renewal of his Ibuprofen and Vicodin prescriptions. (*Id.* at 336). Dr. Franklin cautioned Plaintiff about the risks associated with long term use of narcotics and anti-inflammatories. (*Id.*).

On May 28, 2008, Dr. McGivney discussed the MRI results with Plaintiff, which indicated worsening degenerative disk disease. (R. at 316). Plaintiff had endplate edema on the anterior endplate of L3 and L4, and normal-looking discs at L4–5, L5–S1, and S2–3. (*Id.*). Dr. McGivney opined that the only option would be performing a provocative discography in an effort to prove that this is the pain generator and then surgically stabilize through an interbody fusion at L3–4. (*Id.*).

The lumbar discogram procedure was performed on July 7, 2008. (R. at 297–98). It revealed disk disease at the L3–4, L4–5, and L5–S1 levels, along with concordant pain. (*Id.* at 298, 318). On July 15, 2008, Dr. McGivney opined that three-level de-

generative disk disease does not offer a high success rate for fusion surgery. (*Id.* at 318). He explained to Plaintiff that disk replacement is FDA approved for only one level, which means that Plaintiff would need a fusion at L5–S1 and L4–5 and disk replacement at L3–4. (*Id.*). He recommended that Plaintiff get a second opinion. (*Id.*). Dr. McGivney opined that Plaintiff was able to "do sedentary-type work only but sitting and standing are going to bother him as well." (*Id.*).

A consultative examination was performed by Christopher J. Bergin, M.D. on August 5, 2008, in connection with Plaintiff's worker's compensation case. (R. at 319–21; *see id.* at 334). Plaintiff complained of low-back pain. (*Id.* at 320). On examination, Plaintiff could flex forward to 70° and extend to 20°. (*Id.*). He was able to heel walk, toe walk, squat, and rise without difficulty. (*Id.*). Dr. Bergin diagnosed diskogenic low-back pain with bilateral upper lumbar radiculopathy. (*Id.*). He opined that Plaintiff's rejection of surgical intervention was reasonable, given its unpredictable results. (*Id.* at 321). Dr. Bergin recommended pain management, a new FCE, and a return to work with the FCE restrictions. (*Id.*).

On August 18, 2008, Plaintiff began treating with Avi J. Bernstein, M.D., a spinal surgeon. (R. at 330–31). Plaintiff complained of chronic lower back pain radiating into his buttocks, thighs and calves, which was aggravated by physical activity. (*Id.* at 330). He reported that Ibuprofen helps alleviate his pain. (*Id.*). On examination, Plaintiff had full, unrestricted range of movement of the lumbar spine, good strength, sensation and reflexes, and negative straight-leg-raising test. (*Id.*). Dr. Bernstein opined that the objective examination results do not support Plaintiff's

subjective complaints. (*Id.* at 331). Nevertheless, he acknowledged that the lumbar discogram supports the notion that Plaintiff may have low back pain related to degenerative changes of one or more of his lumbar discs. (*Id.*). However, Dr. Bernstein did not believe that Plaintiff was a reasonable candidate for a multi-level spinal fusion. (*Id.*). He recommended performing another FCE and a second lumbar discogram to identify differential pain complaints and the elucidation of a pain generator. (*Id.*). On October 1, 2008, Dr. Bernstein opined that Plaintiff has an underlying degenerative condition of the lumbar spine that becomes unpredictably symptomatic from time to time. (*Id.* at 332).

On September 4, 2008, Plaintiff began treating with Daniel T. Laich, D.O, of the Illinois Neuro-Spine Center. (R. at 402–08). Plaintiff complained of lower back pain, with sharp pains down his legs and numbness. (*Id.* at 402). The pain is aggravated by standing, sitting, lifting, and climbing stairs, and is relieved by lying down. (*Id.* at 403). Dr. Laich examined Plaintiff again on December 4, 2008. (*Id.* at 399–400). Plaintiff reported that his low-back pain continued, ranging from 4/10 to 10/10, with an average intensity of 7/10. (*Id.* at 399). His pain was exacerbated with standing, walking, climbing stairs, sitting, riding in a car, and lifting, and decreased with lying down. (*Id.*). Dr. Laich discussed the possibility of surgery with Plaintiff. (*Id.*).

On November 24, 2008, the new FCE was performed by ATI Physical Therapy. (R. at 388–95). It recommended that Plaintiff be limited to work at the light physical demand level, which includes occasionally lifting 25 pounds and frequently lift-

ing 15 pounds. (*Id.* at 388). Plaintiff was able to toe walk, heel walk, and heel/toe walk without pain. (*Id.* at 391).

On December 13, 2008, Albert Osei, M.D. performed an internal medicine consultative examination on behalf of the Commissioner. (R. at 409–12). Plaintiff complained of constant back pain, which was reduced to 4/10 when he takes Ibuprofen. (*Id.* at 409). He reported insomnia as a result of the pain. (*Id.*).When the pain is severe, it radiates into both legs. (*Id.*). Plaintiff reported that he can walk about a half a mile and does not need to use a cane. (*Id.* at 410). He can stand continuously and comfortably for 15 minutes and sit up to one hour. (*Id.*) He can lift weights of 34 pounds, pull weights of 41 pounds, and push weights of 71 pounds. (*Id.*). He needs assistance to clean his house, but can bathe, dress, cook, and feed himself. (*Id.*). He drives himself and does his own shopping. (*Id.*).

On examination, Dr. Osei found that Plaintiff could get on and off the exam table without difficulty, could stand from sitting without difficulty, and had full range of motion except in his lumbar joint. (R. at 411). Plaintiff could walk greater than 50 feet without support and was able to heel/tandem walk. (*Id.* at 411–12). He could not toe walk and did not attempt to squat or hop because of fear of inducing pain. (*Id.* at 412). Dr. Osei diagnosed lower back pain with reduced range of motion and multilevel disk disease. (*Id.*).

On January 20, 2009, Charles Kenny, M.D., a nonexamining, state-agency physician, prepared a physical RFC assessment. (R. at 414–21). He reviewed the medical evidence, found Plaintiff credible, and gave controlling weight to Plaintiff's

treating physicians, except for Dr. McGivney's July 15, 2008 assessment, which had limited Plaintiff to sedentary work. (*Id.* at 420–21). Dr. Kenny concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 20 pounds, and stand, walk, and sit for six hours in an eight-hour workday. (*Id.* at 415). On May 8, 2009, Calixto Aquino, M.D. affirmed Dr. Kenny's assessment. (*Id.* at 422–24).

On June 17, 2009, Plaintiff began treating with Chicago Institute of Neurosurgery and Neuroresearch. (R. at 458–61). Plaintiff complained of constant pain in his lower back and numbness in his right leg. (*Id.* at 458). He stated that he can sit for one hour and walk for 20 minutes. (*Id.* at 460). Stretching relieves the pain but bed rest does not. (*Id.*). On a neurologic examination, Leonard J. Cerullo, M.D. found a moderate degree of paralumbar spasm, moderate limitation of the range of motion of the back, normal motor skills, and negative straight-leg-raising test. (*Id.* at 453).

On September 16, 2009, Plaintiff began treating with Kenneth Heiferman, M.D., one of the Chicago Institute's neurosurgeons. (R. at 447–48). Plaintiff presented with low back and leg pain. (*Id.* at 447). He described constant lumbar pain, of variable intensity, which was exacerbated with bending, lying down, and Valsalva maneuvers.[8] (*Id.*). Plaintiff reported that recent injections to address a L3–4 facet block resulted in increased pain. (*Id.*). On examination, Plaintiff had mild lumbar tenderness, intact motor strength, decreased touch sensation in his right thigh with normal pain sensation, no muscle spasms, and negative straight-leg-raise test. (*Id.*).

---

[8] The Valsalva maneuver "is performed by moderately forceful attempted exhalation against a closed airway, usually done by closing one's mouth, pinching one's nose shut while pressing out as if blowing up a balloon." <en.wikipedia.org/wiki/Valsalva_maneuver>

Dr. Heiferman discussed the options of continuing a conservative approach versus surgery, and Plaintiff elected to proceed with surgery. (*Id.*). On the same day, Plaintiff was fitted with an lumbosacral brace. (*Id.* at 446).

On October 9, 2009, Plaintiff underwent L3 through L5 and S1 laminectomies and fusion. (*Id.* at 425). On October 11, a lumbosacral spine MRI found no spinal or foraminal stenosis. (*Id.* at 434–35). Plaintiff was discharged from the hospital on October 14, after being fitted with a lumbar brace. (*Id.* at 425–26). On December 2, 2009, Plaintiff described intermittent pain, which had improved post-surgery. (*Id.* at 443).

On March 3, 2010, Dr. Heiferman found that Plaintiff had made significant improvements. (R. at 438). Plaintiff described occasional, minimal lower back pain with activities such as changing positions; no lower extremity pain; and minimal numbness in right toes, which was progressively improving. (*Id.*). On examination, Plaintiff had no lumbar tenderness, intact motor strength, normal sensation, symmetric reflexes, no muscle spasms, and his surgical wound was healing well. (*Id.* at 439). Dr. Heiferman recommended physical and occupational therapy and opined that Plaintiff could return to work on light duty. (*Id.*). Similarly, on July 14, 2010, he opined that Plaintiff could return to work on light duty, with no lifting greater than ten pounds and no extensive bending. (*Id.* at 436).

**B. Analysis**

Plaintiff raises three arguments in support of his request for a reversal and remand: (1) the ALJ's determination at step three was erroneous; (2) the ALJ's RFC

determination was erroneous; and (3) the ALJ's credibility determination was patently wrong. (Mot. 1, 5–12). The gravamen of Plaintiff's arguments is that the ALJ's determinations were faulty because she substituted her own opinion for that of a qualified medical expert (ME). (*Id.*). The Court addresses each argument in turn.

### 1. *Plaintiff Did Not Meet the Criteria for Listing 1.04*

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (R. at 12). Specifically, that ALJ concluded:

> I have considered Listing 1.00, Musculoskeletal Impairments and 1.04, Disorders of the Spine. However, [Plaintiff] is able to ambulate effectively with the use of a cane. Furthermore, there is no evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication.[[9]] Therefore, [Plaintiff's] impairments do not meet or equal a listing.

(*Id.*). Plaintiff challenges the validity of the ALJ's determination, arguing that "[t]here is no evidence which establishes that [Plaintiff] can ambulate effectively." (Mot. 11). Plaintiff asserts that he meets the criteria for Listing 1.04 and contends that the ALJ could not make a step three determination without consulting with a

[9] "Arachnoiditis is a neuropathic disease caused by inflammation of the arachnoid, one of the membranes that surround and protect the nerves of the central nervous system, including the brain and spinal cord." <en.wikipedia.org/wiki/Arachnoiditis> Lumbar spinal stenosis "is a medical condition in which the spinal canal narrows and compresses the spinal cord and nerves at the level of the lumbar vertebra." <en.wikipedia.org/wiki/Lumbar_spinal_stenosis> Pseudoclaudication (neurogenic claudication) involves painful cramping or weakness in the legs and is a common symptom of lumbar spinal stenosis. <en.wikipedia.org/wiki/Pseudoclaudication>

medical expert (ME). (*Id.*). The Court disagrees. Plaintiff has failed to meet his burden to demonstrate that his impairments satisfy all the requirements of Listing 1.04. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (The "claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing.").

The medical evidence supports the ALJ's determination. Listing 1.04, Disorders of the Spine, requires nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04. Listing 1.04 also requires the inability to ambulate effectively. *Id.* pt. 404, subpt. P, app. 1 § 1.00. The regulations define "inability to ambulate effectively" as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." *Id.* § 1.00(B)(2)(b) (citation omitted) (emphasis added). For example, ineffective ambulation includes "the inability to walk without use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single handrail." *Id.* § 1.00(B)(2)(b)(2).

Plaintiff has not met his burden to provide medical evidence indicating that he cannot ambulate effectively. None of Plaintiff's physicians included any significant ambulatory restrictions in their assessments. (*See*, *e.g.*, R. at 359 (December 2006: able to ambulate freely and restricted only from *prolonged* walking), 304 (February 2007: no ambulatory restrictions), 294 (September 2007: restricted only from walking over 40–60 minutes without resting), 320 (August 2008: heel walk, toe walk, squat, and rise without difficulty), 391 (November 2008: toe walk, heel walk, and heel/toe walk without pain), 412 (December 2008: walk at least 50 feet without support and heel/tandem walk), 436 (July 2010: no ambulatory restrictions)). Moreover, Plaintiff has not presented evidence that he needs to use an assistive device that limits the functioning of *both* arms or that he is incapable of performing routine ambulatory activities. On the contrary, in December 2008, Plaintiff acknowledged that he could walk about a half a mile and did not need to use a cane. (*Id.* at 410). He needs some assistance to clean his house, but can bathe, dress, cook, and feed himself. (*Id.*). He drives himself and does his own shopping. (*Id.*). And, at the hearing, Plaintiff testified that he can walk 10–15 minutes without a cane and is able to cook, wash clothes, and shop. (*Id.* at 46–48, 59–60). Moreover, Plaintiff has not provided medical evidence that he has nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.

Plaintiff contends that the ALJ impermissibly "played doctor" rather than use "expert assessment of the medical evidence . . . to determine whether a listing impairment was met or equaled." (Reply 7–8). He argues that the operative report

from his spinal surgery "included chronic lumbar spondylosis, lateral recess stenosis, and diskogenic pain at three levels, which appears to be as severe as the requirements of Listing 1.04." (Mot. 11). The Court is not persuaded by this argument.

An ALJ must "summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *see also* 20 C.F.R. § 404.1527(e)(2)(iii). But "[a]n ALJ is not required to call a medical expert simply because a claimant has failed to meet his burden of demonstrating that he suffers from an impairment listed in the SSA." *Riley v. Astrue*, No. 11 C 3771, 2012 WL 1655970, at *3 n.2 (N.D. Ill. May 10, 2012); *see Canata v. Astrue*, No. 09 C 5649, 2011 WL 6780923, at *8 (N.D. Ill. Dec. 23, 2011) (decision to call an ME is left to ALJ's discretion). It is also axiomatic that an ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence in the record. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). "An ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record." *Mitchell v. Colvin*, No. 10 C 7464, 2013 WL 3729722, at *9 (N.D. Ill. July 11, 2013). That is exactly what the ALJ did here. The ALJ did not interpret the raw notes from the surgery or raw test results on the contrary. On the contrary, she accepted the treating physicians' interpretations and assessments of the surgery and related tests. *See id.* at *10 ("Moreover, it is not as though all the ALJ had was raw EMG findings; he had the interpretation of a physician. [Plaintiff] seems to suggest that the ALJ was obligat-

ed to have a medical expert review the EMG, in addition to the doctor who interpreted the results. But an ALJ is not required to consult a medical expert where the record is adequate to render a decision."). She had Dr. Hurley's interpretation of a May 2007 EMG, which was normal, and showed no evidence of peripheral neuropathy, lumbar radiculopathy, or neuromuscular disease. (R. at 293, 295). She had Dr. McGivney's interpretations of a May 2008 MRI and July 2008 lumbar discogram, which indicated worsening degenerative disk disease—but no nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. (*Id.* at 298, 316, 318). The ALJ also had the summary results of a post-surgery lumbosacral spine MRI, which found no spinal or foraminal stenosis. (*Id.* at 434–35). And, she had the post-surgery assessments of Dr. Heiferman—one of the physicians who performed the surgery—who concluded that Plaintiff was capable of performing light work, with no indication of any ambulatory restrictions. (*Id.* at 436, 439); Thus, the existing record provided an adequate basis for the ALJ's conclusion that Plaintiff did not meet Listing 1.04. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding that where "the evidence was adequate for the ALJ to find [the claimant] not disabled, . . . the ALJ acted within his discretion in deciding not to call a medical expert").

In sum, Plaintiff has not met his burden of demonstrating that he meets all of the criteria for Listing 1.04. *See Ribaudo*, 458 F.3d at 583.

### 2. *Substantial Evidence Supports the ALJ's Determination that Plaintiff Can Perform Sedentary Work*

The ALJ determined that Plaintiff has degenerative disk disease at L3–4 with continued difficulties following surgery. (R. at 12). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform sedentary work,[10] but he must be permitted to sit or stand at will. (*Id.* at 13). Plaintiff argues that the ALJ erred in this determination by giving "an improper lay opinion that [Plaintiff] could perform sedentary work on a sustained basis from 2006 through the date of the hearing." (Mot. 10). In particular, Plaintiff asserts that "the ALJ chose to disregard the drastic nature of [Plaintiff's] back surgery and improperly assess[ed his] functioning before, during, and after surgery without benefit of an expert opinion." (*Id.*). Thus, Plaintiff contends that the failure to use an ME in these circumstances was improper and warrants remand. (*Id.*).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR)[11] 96-8p, at *2 ("RFC is an

[10] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the

administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence, including physicians' opinions and Plaintiff's testimony. All of Plaintiff's physicians—both treating and consulting—consistently assessed Plaintiff as being able to perform at least sedentary work, both before and after his surgery. (*See* R. at 358 (Dr. Franklin in December 2006: restricted to lifting no more than ten pounds;

Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

no repeated bending, squatting, twisting, or climbing; no continuous standing or sitting; no prolonged walking), 303 (Dr. McGivney in February 2007: no lifting over 30 pounds and no repetitive bending or stooping), 289 (Dr. Hurley in May 2007: return to work in a light duty status), 294 (Dr. Hurley in September 2007: limited to light/sedentary work; lift/carry/pull five to ten pounds; sit/stand/walk as needed, 40–60 minutes maximum; avoid ladders and slippery, uneven surfaces; bend/twist/turn rarely, less than 10% of workday), 318 (Dr. McGivney in July 2008: able to do sedentary work), 388 (ATI Physical Therapy in November 2008: limited to work at light physical demand level; occasionally lifting 25 pounds and frequently 15 pounds), 425–26 (October 2009: back surgery performed), 438 (Dr. Heiferman in March 2010: return to work on light duty); 436 (Dr. Heiferman in July 2010: return to work on light duty, with no lifting greater than ten pounds and no extensive bending)). Moreover, physical examinations performed throughout the relevant time period support the ALJ's RFC assessment. (*See id.* at 304 (Plaintiff had extension to 20° with some pain but no muscle spasms, forward flexion near full to 60° with little pain, negative straight-leg raise, symmetrical deep tendon reflexes, normal strength, full range of motion of knee and ankle, and limited external rotation of both hips, with pain in the posterior SIJ area), 288–89 (Plaintiff had no pain with straight leg raising or with flexion, abduction, and external rotation of either hip; his strength was normal, reflexes symmetrical, but sensory examination showed decreased light touch in the right thigh and outer calf), 293–95 (normal EMG showed no evidence of peripheral neuropathy, lumbar radiculopathy, or neuromuscular dis-

ease), 320 (Plaintiff could flex forward to 70° and extend to 20°, and was able to heel walk, toe walk, squat, and rise without difficulty), 330 (Plaintiff had full, unrestricted range of movement of the lumbar spine, good strength, sensation and reflexes, and negative straight-leg-raising test), 391 (Plaintiff was able to toe walk, heel walk, and heel/toe walk without pain), 410–11 (Plaintiff can get on and off the exam table without difficulty, could stand from sitting without difficulty, and had full range of motion except in his lumbar joint; he can lift 34 pounds, pull 41 pounds, and push 71 pounds; he can walk greater than 50 feet without support and is able to heel/tandem walk), 439 (post-surgery Plaintiff had no lumbar tenderness, intact motor strength, normal sensation, symmetric reflexes, no muscle spasms, and his surgical wound was healing well)).

The ALJ thoroughly reviewed this medical evidence and concluded:

> Although Dr. Heiferman stated that [Plaintiff] can perform his past work but at light duty, I only give this opinion minimal weight, in light of [Plaintiff's] testimony at the hearing, and also consistent complaints of pain to his treating physicians. [Plaintiff] consistently reports level of pain that would preclude him from performing light work. Thus, I also do not give great weight to [Dr. Osei[12]] because I do not feel [Plaintiff] is able to perform that amount of lifting. I also do not give great weight to the opinion evidence from ATI Physical Therapy, as [Plaintiff] credibly appears to be unable to sustain the lifting requirements proposed. Furthermore, the opinions of Drs. Hurly and McGivney from 2007 assessed [Plaintiff] less than a year after the injury. Finally, I do not afford the opinion of Dr. Kenney great weight either, as he was a non-examining physician, and recommended lifting that exceeds [Plaintiff]'s ability.
>
> Dr. McGivney on July 15, 2008, limited [Plaintiff] to sedentary work. Dr. McGivney is [Plaintiff's] physician with a treatment history. I afford this opinion the greatest weight because it is consistent with the

[12] The ALJ inadvertently refers to Dr. Osei as Eric Mitchell, who was the SSA adjudicator, not the examining physician. (*Compare* R. at 409 *with id.* at 412).

> medical record which consistently which [*sic*] substantiates [Plaintiff's] pain: numerous MRIs and x-rays show degenerative disc disease.

(*Id.* at 19) (citations omitted).

The ALJ's RFC determination also took into account those portions of Plaintiff's testimony she found credible. Plaintiff testified that he is in pain, sometimes uses a cane to ambulate, and frequently changes position. (R. at 36–39, 53–56, 59–60). Based on this testimony and the medical evidence, the ALJ limited Plaintiff to sedentary work, which requires lifting only 10 pounds, and allowed him to sit or stand at will. (*Id.* at 13); see 20 C.F.R. § 404.1657(a). Indeed, Plaintiff's testimony was critical in the ALJ's decision to reject the many physicians who opined that Plaintiff was capable of light work, in favor of the single treating physician who found Plaintiff capable only of sedentary work. (R. at 19) (affording Dr. McGivney's opinion the "greatest weight because it is consistent" with the medical evidence and Plaintiff's pain allegations).

In sum, the ALJ fulfilled her responsibility to determine Plaintiff's RFC after weighing the medical source statements and other evidence in the record. *See* SSR 96-5p, at *2 (the determination of an individual's RFC is not a medical issue; instead, it is an administrative finding dispositive of a case), *5 (The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, . . . an individual's own statement of what he or she is able or unable to do, and many other factors that could help the [ALJ] determine the most reasonable findings in light of all the evidence."). She properly weighed the various physician's opinions, and her decision to give the

greatest weight to Dr. McGivney's opinion was supported by substantial evidence, including Plaintiff's testimony. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (ALJ determines how much weight to give various medical opinions, which the Court will uphold if supported by substantial evidence.).

Plaintiff does not contest that all physicians found him capable of performing at least sedentary work. Instead, he contends that the ALJ was not equipped to understand the evidence without the use of an ME. (Mot. 10; Reply 2). For example, Plaintiff asserts that his back surgery demonstrates that he was incapable of working from February 2007, the alleged onset date, until October 2009. (Mot. 10). He argues that since he "had extensive back surgery in [October] 2009, presumably that surgery was necessary to restore him to the ability to work *at any exertional level*." (*Id.*) (emphasis added). But there is no indication in the record that Plaintiff's reason for having the surgery was to restore his ability to work; instead, the evidence indicates that he elected surgery in an attempt to relieve his pain. (*See* R. at 303, 357 (Plaintiff referred to Dr. McGivney, an orthopedic surgeon, after reporting no improvement in his pain), 304 (Dr. McGivney recommended physical therapy, epidural injections, and possible surgery to treat Plaintiff's pain), 347 (after little pain relief from epidural injections, Plaintiff discussed possibility of surgery with Dr. Franklin), 399 (Dr. Laich discussed possibility of surgery to alleviate constant pain), 447 (Plaintiff elected surgery versus continuing a conservative approach to manage pain)). In any event, as discussed above, the medical evidence overwhelm-

ingly supports the ALJ's assessment that Plaintiff was capable of performing at least sedentary work prior to his surgery.

Next, Plaintiff contends that there is no evidence that his surgery was successful. (Mot. 10). He argues that since "at least two doctors stated the likelihood of success [from surgery] was dubious, and recommended that [Plaintiff] not have surgery," a qualified medical expert was necessary to evaluate the evidence. (*Id.*). But the choice to use an ME is left to the ALJ's discretion, *Canata*, 2011 WL 6780923, at *8, and is not necessary where the record is adequate for the ALJ to render a decision, *Mitchell*, 2013 WL 3729722, at *10. And, here, the record provided an adequate basis for the ALJ's conclusion that Plaintiff was capable of sedentary work, both before and after the surgery. *See Skarbek*, 390 F.3d at 504 (finding that where "the evidence was adequate for the ALJ to find [the claimant] not disabled, . . . the ALJ acted within his discretion in deciding not to call a medical expert"). There is no indication that after a short recovery period, Plaintiff's symptoms had worsened post-surgery. On the contrary, within five months of Plaintiff's surgery, Dr. Heiferman opined that Plaintiff could return to work on light duty. (R. at 439; *see also id.* at 436). And Plaintiff acknowledged that his pain had improved post-surgery. (*Id.* at 39, 443). By March 2010, he described occasional, minimal lower back pain with activities such as changing positions; no lower extremity pain; and minimal numbness in right toes, which was progressively improving. (*Id.* at 438).

Finally, Plaintiff contends that he is incapable of working full-time because, at his doctor's recommendation, he attends physical therapy sessions three days a

week for one and one-half hours each time. (Reply 5.) The VE testified that no jobs would exist for someone who was absent three days a week for one and one-half hours each time. (R. at 78–79). But there is no requirement that Plaintiff attend his physical therapy sessions during work hours, and no indication that attending the sessions otherwise precludes him from working.

The Court finds that the ALJ did not err in her determination of Plaintiff's RFC. There is no support for Plaintiff's contention that the ALJ was impermissibly "playing doctor." *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). Instead, the ALJ carefully analyzed the evidence and Plaintiff's testimony to arrive at the maximum that Plaintiff can still do despite his physical limitations. *Craft*, 539 F.3d at 675–76. In sum, substantial evidence supports the ALJ's determination that Plaintiff can perform sedentary work.

***3. Substantial Evidence Supports the ALJ's Credibility Determination***

Plaintiff contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 12–14). He asserts that the ALJ's decision failed to contain specific reasons for her credibility finding, failed to account for Plaintiff's allegations of pain, and could not be assessed without use of an ME at the hearing. (*Id.*; Reply 8–10).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft*, 539 F.3d at 678. The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental

impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms. SSR 96-7p, at *2; *see* 20 C.F.R. § 404.1529(b). "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, at *2; *see* 20 C.F.R. § 404.1529(c). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining

physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

At the hearing, Plaintiff testified that he has physical therapy three times a week and needs a cane to walk longer than 10–15 minutes. (R. at 59–60). He continues to have pain after the surgery, which necessitates frequent changes in position. (*Id.* at 36–39, 53–56). His pain is 4/10 when he takes his Ibuprofen. (*Id.* at 51). The surgery alleviated his constant, shooting pains, but lessened his mobility. (*Id.* at 39). In addition to back pain, Plaintiff suffers from muscle pain throughout his groin area, which makes it difficult to stand or bend, and numbness in his toes, which may be from nerve damage. (*Id.* at 36, 52).

Plaintiff testified that he needs to lie down for at least one-half hour several times a day to relieve the pain and can sit for only an hour before needing to walk, stand, or lie down. (R. at 40–43). Plaintiff has one or two "bad" days a week where

he is capable of doing less than usual. (*Id.* at 60–61). His pain is worse with activity; he must lie down after taking his son to school or doing housework. (*Id.* at 41, 44, 45). He is able to do the cooking, but his sons help out with the heavier housework. (*Id.* at 46–49).

The ALJ found Plaintiff partially credible.

> After careful consideration of the evidence, I find that [Plaintiff's] medically determinable impairment could reasonably be expected to cause the alleged symptoms. [Plaintiff] credibly testified at the hearing that he has difficulty staying in one position for very long, and [Plaintiff] also credibly appears to be unable to lift much weight. He appears to be in some pain. The medical evidence also supports [Plaintiff's] testimony of reported back pain. . . . His extensive medical records consistently document his reports of pain.

(R. at 14–15). However, the ALJ found no "support for [Plaintiff's] subjective allegations as to the disabling nature of his impairments." (*Id.* at 19).

> [T]he history of available medical evidence shows that the pain consistently improved and is manageable, and does not preclude sedentary work . . . . [Plaintiff's] medical history from the time of the onset consistently shows that the pain is decreasing and has leveled out. Furthermore, every treating physician has stated that [Plaintiff] could perform at least sedentary work, with most even recommending light work.
>
> *     *     *
>
> In addition to the objective evidence, I have considered the factors enumerated in SSR 96-7p in evaluating the intensity, persistence and limited effects of [Plaintiff's] symptoms. Numerous factors militate against a finding of greater restriction than that delineated in my residual functional capacity finding. [Plaintiff] credibly appears in pain, but also testified that he is [*sic*] can cook a full meal for his household. Although he needs assistance with cleaning his house, he can perform light housework. He can bathe, dress and feed himself. He also can drive and do his own shopping. He also is able to take ibuprofen and control his pain. He can sit for an hour. Also, Dr. Heiferman reported

> that [Plaintiff] has been prescribed Lyrica.[13] He has a consistent earnings record. Although [Plaintiff] uses a cane to ambulate, this would not impact his ability to perform sedentary work. Finally, he appears to have improved since his last surgery. He no longer has pain radiating into both legs. The numbness of his toes improved.
>
> Based upon all these factors, and on the record as a whole, I do not find support for [Plaintiff's] subjective allegations as to the disabling nature of his impairments to the extent that they are inconsistent with the [RFC]. Consequently, I find that there is no basis to conclude that [Plaintiff] suffers from debilitating pain or other symptoms that would further reduce his residual functional capacity.

(*Id.* at 14–15, 19).

Plaintiff contends that the ALJ failed to properly address the first step in the credibility process. (Reply 9). Plaintiff misapprehends the ALJ's decision. The ALJ *agreed* with Plaintiff at step one of the credibility determination. She clearly found that Plaintiff's degenerative disk disease could reasonably be expected to produce the pain alleged. (R. at 14) ("After careful consideration of the evidence, I find that [Plaintiff's] medically determinable impairment could reasonably be expected to cause the alleged symptoms.").

Nevertheless, Plaintiff argues that without an expert assessing the medical information after May 2009, "the ALJ could not assess the pain to be expected from that evidence." (*Id.*). Thus, Plaintiff asserts that without consulting an ME, the ALJ could not make a proper credibility assessment. (*Id.*). The Court is not persuaded by this argument. As discussed above, the choice whether to call an ME is left to the ALJ's sound discretion, *Canata*, 2011 WL 6780923, at *8, and is not necessary where the record is adequate for the ALJ to render a decision, *Mitchell*, 2013 WL

[13] Lyrica is used to treat pain caused by nerve damage. <www.drugs.com>

3729722, at *10. Here, the record provided an adequate basis for the ALJ to determine whether Plaintiff's impairment could be expected to cause the symptoms alleged. *See Skarbek*, 390 F.3d at 504.

At the second step of the credibility process, Plaintiff contends that the ALJ improperly discounted his testimony that he has to lie down for pain relief. (Mot. 14; Reply 10). Clearly, an individual who must periodically lie down is unable to work even a sedentary job. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 648 (7th Cir. 2012); *Moss*, 555 F.3d at 562; *Craft*, 539 F.3d at 680. But here, the ALJ found that Plaintiff's testimony was contradicted by the objective medical evidence and inconsistent with Plaintiff's activities of daily living. (R. at 19). All of Plaintiff's treating physicians consistently found that Plaintiff was capable of light or sedentary work. (*Id.* at 358, 303, 289, 294, 318, 388, 438, 436). Physical examinations support the ALJ's assessment that Plaintiff was capable of sedentary work on a sustained basis. (*Id.* at 304, 288–89, 293–95, 320, 330, 391, 410–11, 439). Plaintiff acknowledged that his pain was moderated by medications. (*Id.* at 287 (September 2007: improved pain management with Motrin and Vicodin), 330 (August 2008: Ibuprofen helps alleviate pain), 409 (December 2008: pain is reduced to 4/10 when taking Ibuprofen), 443 (December 2009: pain improved post-surgery), 438 (March 2010: occasional, minimal lower back pain), 51 (September 2010: surgery alleviated constant, shooting pains, which is 4/10 when taking Ibuprofen)). And, despite Plaintiff mentioning to Dr. Laich in late 2008 that his pain was relieved by lying down (*id.* at 399, 403), he generally complained that his pain

was *aggravated* by sleeping or lying down (*id.* at 312, 373, 384, 387, 460, 447). Significantly, *none* of Plaintiff's treating physicians recommended lying down to relieve his back pain or included a lying-down option as part of their findings that Plaintiff was capable of sedentary or light work.

The ALJ also found that Plaintiff's activities of daily living undermined his assertion that he needed to lie down to relieve his pain. Plaintiff testified to engaging in numerous activities during the day—cooking, performing light housework, bathing, dressing and feeding himself, driving, and shopping—which the ALJ found are inconsistent with someone who claims debilitating pain. (*Id.* at 19). "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96–7p, at *3, this must be done with care." *Roddy*, 705 F.3d at 639. The Court is mindful "that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id.* But here, the ALJ not only considered Plaintiff's daily activities, but also the objective medical history and Plaintiff's statements to his physicians, in determining that Plaintiff's claims of debilitating pain were not credible. *See Shideler v. Astrue*, 688 F.3d 306, 311–12 (7th Cir. 2012) (in discounting claimant's testimony that he needs to lie down several times a day, the ALJ considered a broad range of factors, including his medical records, treatment history, and daily living activities).

Plaintiff's effort to distinguish *Shideler* is unavailing. He argues that "[i]n *Shideler*, there was no medical evidence for a six-year period, unlike [Plaintiff's] case,

during which the claimant's eligibility for benefits on his earnings record expired." (Reply 10). But it is Plaintiff's comprehensive medical history, together with his daily activities, that supports the ALJ's credibility determination. *See Schideler*, 688 F.3d at 311 ("The ALJ's considerations specifically took into account Shideler's testimony . . . and compared it to the medical and other record evidence in reaching her [credibility] decision.").

In sum, the ALJ concluded that, when viewed together, Plaintiff's daily activities, treating physicians' opinions, and improved pain management, undermined Plaintiff's credibility when describing his pain and disability. "These are exactly the type of factors the ALJ was required to consider." *Pepper*, 712 F.3d at 369. The ALJ provided specific reasons for her credibility finding, supported by substantial evidence. *Moss*, 555 F.3d at 561; *Steele*, 290 F.3d at 942. The ALJ built a logical bridge between the entire case record—including the medical evidence, Plaintiff's statements, and other relevant evidence—and her conclusion. *Schideler*, 688 F.3d at 312; *Arnold*, 473 F.3d at 823; SSR 96-7p.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [13] is DENIED, and Defendant's Motion for Summary Judgment [21] is GRANTED. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

E N T E R:

Dated: August 29, 2013

MARY M. ROWLAND
United States Magistrate Judge